Karen CRAFT, et al., Plaintiffs,

v.

**COUNTY OF SAN BERNARDINO,
et al., Defendant(s).**

No. SDCV 05–00359 SGLOPX.

United States District Court,
C.D. California.

Dec. 7, 2006.

Barrett S. Litt, Litt Estuar Harrison Miller and Kitson, Bryan Barnet Miller, Litt Estuar Harrison Miller and Kitson,

Cynthia M. Anderson–Barker, Cynthia M. Anderson–Barker Law Offices, Donald W Cook, Mann and Cook, Paul J. Estuar, Litt Estuar Harrison Miller and Kitson, Robert Mann, Mann & Cook, Barbara S. Huff, Lynberg & Watkins, Los Angeles, CA, for Karen Craft individually and as class representatives, Ranette Sanchez individually and as class representatives, Rosemary Ryan individually and as class representatives, Georgina Frost, Elroy Hardy, Betty Welch, Veronica Williams, Plaintiffs.

Dana Alden Fox, Lynberg & Watkins, Los Angeles, CA, for County of San Bernardino, San Bernardino Sheriffs Department, Sheriff Gary Penrod, Does 1 through 100, Defendants.

## ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

LARSON, District Judge.

This matter is before the Court on plaintiffs' Motion for Partial Summary Judgment, filed on September 15, 2006. This matter was heard on December 4, 2006. As set forth more fully below, the Court **GRANTS** plaintiffs' Motion for Partial Summary Judgment, for the reasons and in the manner stated.

### I. The Present Motion

Plaintiffs seek partial summary judgment as to parts of their first cause of action (a claim brought pursuant to 42 U.S.C. § 1983) and their second cause of action (a claim brought pursuant to Cal. Civ.Code § 52.1(b)). Specifically, plaintiffs' Motion seeks adjudication on the following issues:

(1) SBSD's policy of subjecting the following individuals to strip and/or visual body cavity searches pursuant to a blanket policy and absent reasonable suspicion violates (a) the Fourth Amendment of the United States Constitution, (b) Article 1, § 1 of the California Constitution (right to privacy), and (c) Article 1, § 13 of the California Constitution (right to be free from unreasonable searches): Arrestees returning from court who are entitled to release as a result of their court appearance.[1]

(2) SBSD's policy of subjecting the following individuals to strip and/or visual body cavity searches pursuant to a blanket policy and absent reasonable suspicion violates (a) the Fourth Amendment of the United States Constitution, (b) Article 1, § 1 of the California Constitution (right to privacy), and (c) Article 1, § 13 of the California Constitution (right to be free from unreasonable searches): Arrestees who are transferred from a Type 1 facility to a Type 2 facility, who have not been arraigned, and who are charged with crimes that involve neither drugs nor violence.[2] The Court will refer to these individuals as "transferees."

### II. Uncontroverted Facts

San Bernardino County operates its own county jails under the auspices of the San Bernardino County Sheriff's Department ("SBSD"). The San Bernardino County jails are broadly classified as either "Type 1" or "Type 2." A "Type 1" jail can only house prisoners for a few hours, extending no more than a day or so. A "Type 2" jail is one that can book arrestees and house

---

1. Although it is not entirely clear from plaintiffs' papers, it appears to the Court that this category consists of members of Class Two, as defined by the Court's class certification order.

2. Although it is not entirely clear from plaintiffs' papers, it appears to the Court that this category consists of members of Class One, including the three subclasses, as defined by the Court's class certification order.

prisoners for extended periods, including for the term of a jail sentence.

The Sheriff's Department Manual provides a definition of a strip search as a thorough search of an arrestee, by a departmental employees of the same sex . . . accomplished in a location restricted from the view of other persons not necessarily participating in the search, and accomplished by requiring the arrestee to completely disrobe and submit to a visual examination of the arrestee's body and a careful detailed physical examination of all clothing items prior to allowing the arrestee to redress. The visual examination shall consist of requiring the arrestee to open the mouth, raise the arms, display the bottoms of the feet, and raise the breasts or testicles, when applicable, to guarantee that no item is secreted in these places. Additionally, the arrestee shall be required to bend forward at the waist and simultaneously spread the buttocks to allow the searching officer to view the openings of the anus and vagina to ensure that no protruding objects are present. When the scalp is not reasonably visible, the arrestee shall be required to run fingers through the hair in such a manner as to dislodge any object secreted in the hair.

Sheriff's Department Manual § 3.1115.14 (attached as Ex. 3 to the Estuar Decl.).

Pursuant to policy and practice, all arrestees who are returned to a jail facility from court are subjected to a strip and/or visual body cavity search, regardless of whether there is individualized suspicion to conduct the search. This policy and practice of strip and/or body cavity searches of individuals returning from court includes searches of arrestees who become entitled to release as a result of their court appearance.[3]

SBSD's policy and practice is to strip and/or visual body cavity search all arrestees (including those booked on non-violent, non-drug related charges) who are transferred from a Type 1 facility to a Type 2 facility prior to his or her arraignment. The search is conducted pursuant to a blanket policy, regardless of whether there is individualized suspicion to conduct the strip and/or visual body cavity search on the arrestee.

Before being subjected to a strip and/or visual body cavity search, individuals are separated by gender. *See* Brown Depo. at 28, 33; Fonzi Depo. at 33, 36; Tanguay Depo. at 34–35. However, the individuals are not separated from each other for the duration of the search; the strip and/or visual body cavity searches are conducted in a group setting.[4] *See* Brown Depo. at 29, Fonzi Depo. at 33, 37; Tanguay Depo. at 36.

### III. Summary Judgment Standard

Summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

---

**3.** Defendants purport to dispute this, but the evidence to which they point establishes only that the release process, based on their existing procedures, takes some time to accomplish after the arrestee's return from court.

**4.** Although defendants do not controvert the fact that the searches take place in a group setting, they present evidence of some other measures taken to preserve the individual's privacy. At CDC, deputies not involved in the search can observe the search because of windows in the marshalling cell lead to an adjacent corridor. Brown Depo. at 30. At West Valley, males are searched in a transportation area with the door closed; a camera monitors the search, but does not record it. Fonzi Depo. at 33–36. At Glen Helen, females are searched in a room with one door that is closed during the search. Tanguay Depo. at 35–36.

that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Whether a fact is material is determined by looking to the governing substantive law; if the fact may affect the outcome, it is material. *Id.* at 248, 106 S.Ct. 2505.

If the moving party meets its initial burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Mere disagreement or the bald assertion that a genuine issue of material fact exists does not preclude the use of summary judgment. *Harper v. Wallingford*, 877 F.2d 728 (9th Cir.1989).

The Court construes all evidence and reasonable inferences drawn therefrom in favor of the non-moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Brookside Assocs. v. Rifkin*, 49 F.3d 490, 492–93 (9th Cir.1995).

## IV. Fourth Amendment

Both sides understand that, in analyzing whether the searches at issue violate the Fourth Amendment, the Court must apply the balancing test set forth in *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979):

The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.* This test has been applied by the Ninth Circuit most recently in *Way v. County of Ventura*, 445 F.3d 1157 (9th Cir.2006) (finding unconstitutional a strip search of an arrestee, performed pursuant to a blanket policy, where the arrestee was arrested on a charges of being under the influence of a controlled substance), *cert. denied*, —— U.S. ——, 127 S.Ct. 665, 166 L.Ed.2d 513 (2006). Accordingly, the Court looks to the four factors of scope, place, manner, and justification to determine if the uncontroverted facts establish the constitutional violations advanced by plaintiffs.

As to the scope of the intrusion, the Ninth Circuit has justifiably recognized that the strip and/or visual body cavity search at issue in *Way*, and at issue here, is "frightening[ly] invasi[ve]" and "humiliating."[5]

The scope of the intrusion here is indisputably a frightening and humiliating invasion, even when conducted with all due courtesy.... Its intrusiveness cannot be overstated.... [T]he fact that a strip search is conducted reasonably, without touching and outside the view of all persons other than the party performing the search, does not negate the fact that a strip search is a significant

---

**5.** The search procedure at issue here does not differ in any material respect to that at issue

in *Way*. 445 F.3d at 1159.

intrusion on the person searched .... The feelings of humiliation and degradation associated with forcibly exposing one's nude body to strangers for visual inspection is beyond dispute.

*Id.* at 1160 (internal citations and quotation marks omitted). The factor regarding the intrusiveness of the search strongly favors plaintiffs.

As to the manner of the search, Defendants argue, in conclusory fashion, that "inmates ... are not subjected to a search that is excessive, vindictive, harassing, or unrelated to any legitimate penological interest." Opp. at 9. Here, however, it is undisputed that the searches are conducted in a group setting, with the individuals separated only by gender. Although defendants have presented evidence of some measures taken to preserve the privacy of those being searched, the evidence of record reveals that they have taken no steps to conduct the searches on an individual basis and have instead continued to conduct the searches *en masse* without any attempt to limit the humiliation occasioned by conducting the searches in full view of dozens of other individuals. In *Way*, although the Ninth Circuit ultimately found the blanket policy at issue to be unconstitutional, it looked favorably upon the fact that the search was conducted by one officer, with no one else present. *Way*, 445 F.3d at 1160–61; *cf. Beard v. Whitmore Lake School Dist.*, 402 F.3d 598, 606 (6th Cir.2005) (noting that "[t]he fact that the searches of the females did not occur in the presence of only school officials, but rather in the presence of other [female] students, further supports the conclusion that the searches were unreasonable"). Accordingly, the factor regarding the manner of the search also strongly favors plaintiffs.

The place of the search varies, not surprisingly, based on the facility in which the arrestees are taken. The uncontroverted evidence reveals that varying degrees of effort have been made in conducting the searches in places designed to provide some protection the arrestees' privacy. *See supra* n. 4. However, these meager attempts are vastly overshadowed by conducting the searches in a group setting.

The justification advanced by defendants is both predictable and legitimate: They are interested in maintaining security in the jail facilities and in the other locations they take the arrestees. The Court is not unsympathetic to defendants' attempt to ensure security within the jail facilities. As the Ninth Circuit has noted: "We recognize the difficulty of operating a detention facility safely, the seriousness of the risk of smuggled weapons and contraband, and the deference we owe jail officials' exercise of judgment in adopting and executing policies necessary to maintain institutional security." *Way*, 445 F.3d at 1161. Nevertheless, jail officials must structure their attempts to maintain security with the clear dictates of the Constitution. *See id.* ("However, this does not mean that a blanket policy is constitutionally acceptable simply by virtue of jail officials' invocation of security concerns.... Rather, the policy must be 'reasonably related' to the [detention facility's] interest in maintaining security.") (internal quotation marks and citation omitted).

As to the arrestees who are entitled to release as a result of their court appearance, defendants argue that, if they knew they would not be subjected to a strip and/or visual body cavity search upon their return to the facility, they would have motivation to smuggle contraband in for the benefit of friends they wish to please (and/or enemies they wish to appease). However, defendants offer no admissible

evidence that supports this argument.[6]

Defendants do not separately articulate a specific justification for the searches of the transferees upon transfer from a Type 1 to a Type 2 facility, but it is evident from the record that they are concerned with the opportunity such individuals may have to smuggle contraband into the Type 2 facility.

A common theme runs through these two separate categories of arrestees: The concerns regarding these arrestees' ability to smuggle contraband into the general population of a Type 2 facility.

At the outset, it is worth noting that the Ninth Circuit has clearly recognized that arrestees' intermingling with other detained persons can impact upon whether a given strip and/or visual body cavity search is constitutionally permissible, but it cannot, by itself, provide justification for such a search:

> The defendants seek to justify the strip search with the fact that [plaintiff] was being moved from the holding area to a cell area on a different floor of the justice center. Several cases have recognized imminent mingling with other inmates as a consideration in the decision whether to strip search a detainee. However, the fact of intermingling alone has never been found to justify such a search without consideration of the nature of the offense and the question of whether there is any reasonable basis for concern that the particular detainee

will attempt to introduce weapons or other contraband into the institution.

*Masters v. Crouch,* 872 F.2d 1248, 1254 (6th Cir.1989), *cert. denied sub nom., Frey v. Masters,* 493 U.S. 977, 110 S.Ct. 503, 107 L.Ed.2d 506 (1989), *cited with approval in Thompson v. City of Los Angeles,* 885 F.2d 1439, 1447 (9th Cir.1989). As for the pre-arraignment transferees at issue in the present Motion, the only change in their status when they move from a Type 1 to a Type 2 facility is the potential that they will intermingle with the general population. Based on *Thompson,* this change in status is not enough in all cases to tip the scales in favor of the constitutionality of a blanket strip search policy.

More importantly, for purposes of the present analysis, intermingling with the general population is not necessary. *See Thompson,* 885 F.2d at 1447 (noting that the "fact that arrestee may ultimately be intermingled with general jail population does not, by itself, justify strip search as such intermingling is 'both limited and avoidable'") (quoting *Giles v. Ackerman,* 746 F.2d 614, 618 (9th Cir.1984) (per curiam), *overruled on other grounds, Hodgers–Durgin v. de la Vina,* 199 F.3d 1037, 1040 (9th Cir.1999)). As is obvious from the record, the court returnees are returned to their housing assignment temporarily for purposes of administrative convenience while their paperwork is processed and in order to collect any belongings they may have there. As became obvious based on

---

**6.** Specifically, defendants note that returnees entitled to release will "logically have more motivation to smuggle contraband than ... pretrial detainees." The evidence to which they cite does not support such a position. The commanding officer of the WVDC, Captain Fonzi, states the following in his declaration:

> A fresh or newly arrested person has fewer opportunities to plan and/or smuggle illegal contraband into a secure facility. How-

ever, an arrestee who is already in custody and moving from one facility to another, whether it be a Type One, Type Two, courthouse or hospital facility (i.e. transfers) will have a greater opportunity to plan and/or smuggle contraband.

*Id.* ¶ 15. This statement is conclusory, it lacks foundation, it is speculative, and the declarant does not elaborate upon it. Therefore, plaintiffs' objection thereto is sustained.

the arguments of counsel at the hearing on this matter, the transferees need not be transferred from a Type 1 to a Type 2 facility prior to their arraignment; they are transferred merely to facilitate their efficient transport to court appearances.

Defendants also argue that strip and/or visual body searches of transferees have revealed contraband on the transferees from Type 1 to Type 2 facilities. However, a review of that evidence reveals that only two such discoveries were made between April 8, 2005, and the present. *See* Simon Decl. ¶ 10 (a lighter found on a transferee); Garcia Decl. ¶¶ 1—6 (two baggies of white crystal substance that field-tested positive for amphetamine found on a transferee). Moreover, the evidence does not reveal whether these two discoveries were made pursuant to a search of a pre-arraignment transferee (such as the ones at issue in the present case), to say nothing of the fact that defendants make no attempt to demonstrate that any *particular* pre-arraignment transferee had been identified as likely or potentially likely to smuggle contraband in a manner likely to be detected by a strip and/or visual body search. *See Bull v. City & County of San Francisco*, No. C 03–01840 CRB, 2006 WL 449148, at *6 (N.D.Cal., Feb.23, 2006) ("It is not enough, as defendants would have it, for the government to demonstrate that contraband smuggling is a significant problem. Instead, there must be some reasonable relationship between the criteria used to identify individuals as eligible for a strip search and the interest in preventing the introduction of contraband.") (citing *Giles*, 746 F.2d at 618).

Defendants also suggest that they lack the resources to change their procedures. That may be so. However, it is evident from a review of the case law, the record before the Court, and the arguments pre-sented by counsel, that defendants also lack the will to change their procedures. The Court is not unsympathetic to a governmental entity's contention that it must operate within a budget; however, the Court is precluded from excusing noncompliance with the Constitution on that basis. A lack of funds does not justify what is otherwise a constitutional violation. *See N.G. v. Connecticut*, 382 F.3d 225, 234 (2d Cir.2004) ("Arguably, it was more convenient for the personnel at GDC to strip search S.C. upon her admission there, rather than determine whether she had been strip searched upon her prior admission to NHJDC and had remained in custody throughout the transfer process. Mere convenience, however, cannot be a sufficient interest to justify such a serious impairment of privacy"); *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 392, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) ("[F]inancial constraints may not be used to justify the creation or perpetration of Constitutional violations."); *Stone v. City and County of San Francisco*, 968 F.2d 850, 858 (9th Cir.1992) ("The City argues that it faces a financial crisis that prevents it from funding these programs, but federal courts have repeatedly held that financial constraints do not allow states to deprive persons of their constitutional rights"), *cert. denied*, 506 U.S. 1081, 113 S.Ct. 1050, 122 L.Ed.2d 358 (1993).

In essence, the justification offered by defendants is that of administrative convenience. Their procedures appear to move tens of thousands of inmates to and from court appearances in an efficient manner each year. However, these procedures do nothing to protect the Fourth Amendment rights of the two categories of individuals identified by plaintiffs in their Motion.[7] The justification factor strongly favors plaintiff.

_____

7. Additionally, the procedures do not serve the interests of the individual deputies who

Applying the *Bell* balancing test, therefore, the Court finds that the uncontroverted facts establish that the blanket policies at issue violate the Constitution when conducted on arrestees returning from court who are entitled to release as a result of their court appearance, and when conducted on pre-arraignment arrestees who are charged with crimes that do not involve violence or drugs. The intrusive nature of the search is beyond dispute, and the place and manner in which it is conducted does very little to protect the arrestees' privacy. The justification offered by defendants is essentially that of administrative convenience, and does not tip the scales in favor of finding the blanket policies at issue constitutional.

As to the court returnees entitled to release, although defendants conduct the searches in order to maintain institutional security, they create the security concerns they seek to address by failing to segregate individuals entitled to release from those who are and/or who will be returned to the general population. This category of plaintiffs are, by definition, those who became entitled to release as a result of their court appearances. A blanket policy of subjecting these individuals to strip and/or visual body cavity searches cannot be reconciled with the Fourth Amendment. *Cf. Ward v. San Diego County*, 791 F.2d 1329, 1333 (9th Cir.1986) ("In most instances the unreasonableness of a strip search conducted prior to an [own recognizance] release determination is plain."), *cert. denied sub nom.*, 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987).

As to the transferees, these are individuals who are transferred from a Type 1 facility to a Type 2 facility, who have not been arraigned, and who are charged with crimes that involve neither drugs nor violence. Under clearly established law, absent reasonable suspicion, they may not be subjected to a strip and/or body cavity search upon their arrest. *See Giles*, 746 F.2d at 615 ("We hold that arrestees for minor offenses may be subjected to a strip search only if jail officials have a reasonable suspicion that the particular arrestee is carrying or concealing contraband or suffering from a communicable disease."). Their transfer, and subsequent intermingling with the general population of the Type 2 facility to which they are transferred, does not, absent reasonable suspicion, justify a strip and/or visual body cavity search where one was not justified previously. *See Thompson*, 885 F.2d at 1447.

Accordingly, plaintiffs are entitled to summary judgment as to their first cause of action brought pursuant to 42 U.S.C. § 1983, to the extent that claim is brought by Classes One and Two, and to the extent that the claim is brought based on plaintiffs' Fourth Amendment rights.[8]

## V. California Constitutional Claims

Plaintiffs also seek partial summary judgment as to parts their second cause of action, brought pursuant to Cal Civ.Code § 52.1(b), which authorizes a civil cause of action by an individual whose federal or state constitutional rights are interfered with in a manner prohibited by Cal. Civ. Code § 52.1(a). Section 52.1(a), in turn, prohibits "threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights" guaranteed by the United States and California Constitutions.

---

perform the strip and/or visual body cavity searches. *These deputies may be held personally liable for damages—including punitive damages—for their role in these clearly established constitutional violations.*

8. The first cause of action is also based on plaintiffs' *Eighth Amendment rights*. *See* Third Amended Compl. ¶ 81.

Plaintiffs base their § 52.1(b) claim on their right to privacy guaranteed by Cal. Const. Art. 1, § 1, and their right to be free from unreasonable searches guaranteed by Cal. Const. Art. 1 § 13. *See* Cal. Const. Art. 1, § 1 ("All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."); Cal. Const. Art. 1 § 13 ("The right of the people to be secure in their persons, houses, papers, and effects against unreasonable seizures and searches may not be violated ....").

### A. *Right to Privacy Claim*

A violation of the California constitutional right to privacy gives consideration to three factors: (1) A legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; (3) conduct by defendant constituting a serious invasion of privacy. *See Trujillo v. City of Ontario*, 428 F.Supp.2d 1094, 1119 (C.D.Cal.2006) (citing *Hill v. National Collegiate Athletic Assn.*, 7 Cal.4th 1, 39–40, 26 Cal.Rptr.2d 834, 865 P.2d 633 (1994)). A defendant can prevail where he or she negates any one of these interests. *Id.* Defendants have not argued that plaintiffs have failed to establish any of these elements, nor would such an argument prevail in light of the analysis set forth above in connection with plaintiffs' Fourth Amendment claim. Additionally, however, a defendant may prevail by showing justification. *Id.* ("Defendants can prevail on a California Constitution privacy claim by ... establishing that the 'invasion of privacy is justified because it substantively furthers one or more countervailing interests.'") (quoting *Hill,* 7 Cal.4th at 40, 26

Cal.Rptr.2d 834, 865 P.2d 633). For reasons set forth above in connection with the Fourth Amendment analysis, defendants cannot establish a countervailing interest that justifies the invasion of privacy.

### B. *Right to Be Free from Unreasonable Searches Claim*

The United States Constitution defines the minimum protection provided under Art. 1, § 13 of the California Constitution. *See In re Lance W.*, 37 Cal.3d 873, 875, 210 Cal.Rptr. 631, 694 P.2d 744 (1985). Accordingly, for all the reasons that the policies at issue violate the Fourth Amendment, they violate Art. 1, § 13 of the California Constitution.

Accordingly, plaintiffs are entitled to summary judgment as to their second cause of action brought pursuant Cal Civ. Code § 52.1(b), to the extent that the claim is brought based on plaintiffs' Fourth Amendment rights and the rights guaranteed by Art. 1, §§ 1 and 13 of the California Constitution.[9]

### VI. Conclusion

For the reasons set forth herein, the Court **GRANTS** plaintiffs' Motion for Partial Summary Judgment, and the Court finds that, based on the uncontroverted facts, as to arrestees returning from court entitled to release, and as to transferees (as defined herein), the SBSD's blanket policies of conducting strip and/or visual body cavity searches violates the Fourth Amendment, Article 1, § 1 of the California Constitution, and Article 1, § 13 of the California Constitution.

IT IS SO ORDERED.

9. The second cause of action is also based on plaintiffs' Eighth Amendment rights, rights guaranteed by Article I, §§ 7 and 17 of the California Constitution, and Cal.Penal Code § 4030. *See* Third Amended Compl. ¶ 81.